# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

LEIGH BROWN,

|  |  |  |
|---|---|---|
|  | Plaintiff, |  |
| -v.- |  | 3:15-CV-685 |
|  |  | (ATB) |
| COMMISSIONER OF SOCIAL SECURITY, |  |  |
|  | Defendant. |  |

PETER A. GORTON, ESQ., Attorney for Plaintiff
LAUREN E. MYERS, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## MEMORANDUM DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, by the Honorable Thomas J. McAvoy, Senior United States District Judge, by Order dated October 8, 2015, in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1, and the consent of the parties. (Dkt. No. 16).

## I.    PROCEDURAL HISTORY

On March 30, 2012, plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits ("DIB"). (Administrative Transcript ("T") 78, 224).  On August 23, 2012, plaintiff protectively filed a Title XVI application for Supplemental Security Income ("SSI"). (T. 89, 199).  In both applications, plaintiff alleged a disability onset date of January 1, 2010 due to depression, anxiety, agoraphobia, and back pain.[1] (T. 12, 192).  Both claims were denied initially on

---

[1] Plaintiff had previously filed applications for DIB and SSI benefits that were initially denied on September 28, 2010. (T. 12).  Plaintiff did not request a hearing as a result of these denials.  The

November 16, 2012. (T. 100-107).

Plaintiff requested a hearing which was held on December 17, 2013, before Administrative Law Judge ("ALJ") Bruce Fein, at which plaintiff testified. (T. 44-77). On April 24, 2014, ALJ Fein issued a decision denying plaintiff's application for benefits. (T. 12-23). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on May 11, 2015. (T. 1-6).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of

ALJ found that the plaintiff's current applications presented an implied request to reopen the prior denials, but also found that there was "no reason to reopen." (T. 12). Accordingly, "the earliest that disability could be found in plaintiff's case was September 29, 2010, which was the date of the initial adverse determination of the 2010 applications, notwithstanding plaintiff's assertion of a January 1, 2010 onset date. (*Id.*)

2

substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B.     Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ

cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz*

*v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No.

09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  FACTS

Plaintiff was thirty-two years old at the time of the hearing and testified that he

was 5'3" tall and weighed approximately 123 pounds. (T. 46-47).  He completed the

eighth grade, but stated that he dropped out of school in the ninth grade because he got

"depression," making it difficult to be around other students. (T. 47).  Plaintiff stated

that, although he never obtained a General Equivalency Diploma ("GED"), he did get a

"culinary" certificate after taking a five-hour course through the Broome County Health

Department. (T. 48).

Plaintiff testified that in 1999, he worked as a dishwasher at a restaurant in

Florida.  This job ended because the manager got fired, and the restaurant was sold. (T.

50).  In 2000, plaintiff worked for two months doing "collections over the phone" at

Nationwide Credit.  He left that position because he had "[b]ad anxiety there" due to

the number of employees with whom he had to work. (T. 51).  From 2003 until 2008,

plaintiff worked as a dish washer and as line cook at the Binghamton Country Club.[2]

(T. 48).  Plaintiff testified that he was laid off from this job because "it was

---

[2] The court notes that the ALJ asked plaintiff about the physical requirements of all the jobs that he performed. (*See e.g.* T. 48-57).  However, this action involves only plaintiff's mental impairment, and thus, the court will not discuss plaintiff's physical abilities.

wintertime." (T. 50). Plaintiff also worked as a grill cook at "Five Guys" for three or four months, but the restaurant was busy, and he left that position due to anxiety. (T. 53). Plaintiff also worked for two or three months at a newspaper company putting bundles of papers together and inserting ads, but left that job because "[t]he anxiety [and] depression really got [him]." (T. 54). He worked at a hotel as a breakfast cook, but left that job due to his anxiety and depression. (T. 55). Plaintiff testified that he told his boss that he could not handle the work because of his anxiety." (*Id.*)

Plaintiff's most recent work was as a "[m]eat clerk" for the Price Chopper grocery store in Binghamton. (T. 56). Plaintiff worked at the Price Chopper job for two or three months, but then asked his manager for "medical leave" due to his anxiety and depression. (T. 57). Plaintiff testified that he realized that he needed to get himself "some [mental] help." (*Id.*) Plaintiff began seeing his primary care provider, Physicians Assistant ("PA") Patricia Vincent, and Social Worker ("LSW") Thomas Butler for his mental condition. (T. 57-58). Plaintiff testified that he has never seen a psychiatrist for his mental impairments. (T. 58). PA Vincent originally prescribed Zoloft for plaintiff's anxiety and depression, but plaintiff did not like the side effects. As a result, PA Vincent changed plaintiff's medication to Effexor for his anxiety and depression as well as Ambien for his insomnia. (T. 58). Plaintiff testified that he suffered from insomnia for a "long time," but in the past, he simply "dealt with it" by "being tired." (T. 59).

Plaintiff testified that he lived with his mother, and that he had three children - two girls and one boy - who lived with their respective mothers. (T. 64). However, plaintiff stated that he had frequent visitation rights with his twelve-year-old son. (*Id.*) Plaintiff testified that his mother did most of the shopping, cooking, laundry, and house cleaning. (T. 65-66). Plaintiff testified that he would go shopping, but his mother went more often than he did. He stated that he tended to go shopping at night when there were less people in the store, which reduced his anxiety. (T. 65). Plaintiff does not have a driver's license. (T. 66).

Plaintiff testified that in a typical day, he gets out of bed, has a cup of coffee, sits down, checks to see if he has any appointments, chats with his mother a while, and sits around on the couch, reading cookbooks. After dark, he goes to the store, if necessary. (T. 66-67). He occasionally listens to a "relaxation tape." (T. 67). He watches movies with his son. (*Id.*) In the past, he has had one or two friends, but at the time of the hearing, he stated that he had no friends other than his family. (T. 67-68). Plaintiff testified that he generally sleeps three to five hours per night, but that two or three nights per week, he is able to sleep for six hours. (T. 68-69). He takes Ambien two nights per week, but does not like to take it because it makes him feel "dopey," even after he wakes up. (T. 69).

At the time of the hearing, plaintiff was taking Effexor for his depression. (T. 70). When the ALJ asked plaintiff whether the Effexor was working, plaintiff stated:

"Somewhat. No. Yes. Kind of. [and] Middle wise [sic]." (T. 70). However, he stated that his PA "thinks it's kind of helping," but plaintiff stated that he only saw his PA once per month. (T. 70). Plaintiff testified that his Broome County Mental Health ("BCMH") counseling was helping "somewhat." (T. 70-71).

Plaintiff testified that when he gets anxious, his heart starts racing and he gets "a little dizziness." (T. 71). He stated that his anxiety was triggered by having other people around, but he was able to work at the County Club job for five years, where he would have to "go out in front of the customers." (T. 71-72). Even when he was a "line-cook," he had to go out in front of the customers on weekends because he was also in charge of "carving." (*Id.*)

The ALJ asked plaintiff about his relationships, and pointed out to him that he must have had "at least one friend within the last four years," because he fathered two children during that time. (T. 75). Plaintiff testified that the relationship with the children's mother ended two years prior to the ALJ hearing. (T. 75). Plaintiff also testified that although his mother did many things for him, she was also "on disability" due to her anxiety, depression, cancer, and "a couple of other things." (*Id.*) She helped plaintiff through the "appeal process." (T. 75-76).

The medical records in this case include consultative examinations by Sandra Boehlert, M.D. (Internal Medicine) and Justine Magurno, M.D. (Internal Medicine), dated September 17, 2010 and November 5, 2010, respectively; and a consultative

psychiatric evaluation by Mary Ann Moore, Psy. D., dated November 5, 2012. (T. 241-44, 278-81, 282-87). The records also contain reports by Patricia Vincent, plaintiff's treating PA from Lourdes Hospital ("Lourdes"), who prescribes plaintiff's medications, and from plaintiff's clinical social worker, LSW Thomas Butler, from BCMH. (T. 247-51, 301-330 (BCMH), 261-77, 289-97 (Lourdes), 331-35 (Questionnaire (RFC) - PA Vincent), 336-38 (Questionnaire - LCSW Butler). The administrative transcript also contains records from plaintiff's "Emergency Psychiatric Evaluation" dated March 8, 2013. (T. 340-49). Rather than reciting all the medical evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV. __THE ALJ's DECISION__

After finding that plaintiff met the insured status requirements for DIB benefits through June 30, 2015, the ALJ found that plaintiff had not engaged in substantial gainful activity since September 29, 2010.[3] (T. 14). The ALJ found that plaintiff's chronic low back pain and dysthymia[4] were severe impairments at step two of the disability analysis. (T. 15-17). At step three, the ALJ determined that plaintiff's

---

[3] Although plaintiff worked at some of the jobs discussed above after the alleged onset date, such as his newspaper and meat clerk jobs, the work that plaintiff performed did not rise to the level of SGA. (T. 14-15).

[4] Dysthymia is also known as "persistent depressive disorder" and is a continuous, long-term form of depression. http://www.mayoclinic.org/diseases-conditions/persistent-depressive-disorder/home/ ovc-20166590.

impairments were not of Listing severity.[5] (T. 17-18).

The ALJ determined that plaintiff could perform light work.[6] (T. 18-21). Mentally, the ALJ found that plaintiff could "work in a low stress job . . . with only occasional decision-making required, only occasional changes in the work setting required and occasional judgment being required." (T. 18). In making this finding, the ALJ discussed the November 5, 2012 report by Dr. Moore, who concluded that the plaintiff could follow and understand simple directions and instructions, perform simple tasks under or without supervision, and learn simple as well as complex tasks. (T. 19). The ALJ also cited Dr. Moore's finding that plaintiff "might have some problems relating adequately with others, making appropriate work decisions and maintain[ing] a regular work schedule due to depression and anxiety." (*Id.*)

The ALJ also cited the November 15, 2012 report of non-examining psychologist – T. Harding, Ph.D. (T. 78-88, 89-99). After reviewing the medical records, Dr. Harding found that plaintiff could understand, carry out and remember simple instructions and use appropriate judgment to make simple, work-related decisions. Dr. Harding also found that plaintiff "might" have some difficulty responding appropriately to supervision, coworkers, work situations and dealing with changes in a routine work

_____

[5] Plaintiff does dispute the ALJ's findings at either step two or step three.

[6] As stated above, the plaintiff does not challenge the physical RFC established by the ALJ, the court will not discuss the basis for this finding.

setting. He would need unskilled entry-level work where he did not work closely with others. (T. 19).

The ALJ gave "great evidentiary weight" to the examining consultative and the non-examining state agency psychologists – Dr. Moore and Dr. Harding. (T. 21). The ALJ stated that Dr. Moore's report advised that plaintiff could follow and understand simply directions and instructions, perform simple tasks under, or without, supervision, and learn both simple and complex tasks. (T. 19). Dr. Moore found that the plaintiff could perform the "basic mental demands of competitive, remunerative, unskilled work, and Dr. Harding "appears to have based his assessment of mental limitations on Dr. Moore's findings." (T. 22).

The ALJ reviewed PA Vincent's and LSW Butler's progress notes as well as the "Questionnaires" they completed regarding plaintiff's abilities. (T. 19-21, ). The ALJ gave "[l]ittle evidentiary weight to the questionnaires because "the assessments were prepared on the same blank form" and the responses were vague and "mostly" failed to identify the reasons supporting the opinion. (T. 21) (citing (T. 331-35, 336-38). The ALJ found that plaintiff did have limitations in the categories cited by PA Vincent and LSW Butler, but the limitations were not as severe as indicated on the questionnaires. (T. 21). Instead, the ALJ stated that "the severity stated [in the questionnaires] cannot be justified based on the record as a whole and specifically on the content of the treatment notes prepared by Mr. Butler and Ms. Vincent. The mental limitations I have

11

found are based on these assessments." (*Id.*)  The ALJ discounted plaintiff's credibility regarding the "intensity, persistence, and limiting effects" of his alleged symptoms. (T. 20-21).  The ALJ found that plaintiff's comments about lack of friends were "overstated," given that he had children by two different women.  The ALJ also found it inconsistent that plaintiff claimed to have left school because he did not like being around others, while stating that he was often absent from school because he was spending time with friends. (*Id.*)

The ALJ found that although plaintiff could not perform any of his past relevant work, he was able to perform jobs which exist in significant numbers in the national economy because his "occupational base at the levels of light and sedentary work are maintained." (T. 22).  The ALJ based his findings on the Medical Vocational Guidelines, and determined that plaintiff was not disabled.

## V.    ISSUES IN CONTENTION

Plaintiff raises four numbered arguments in support of his position:

1.    The ALJ failed to account for plaintiff's "moderate limitations" in the RFC determination. (Pl.'s Br. at 6-8) (Dkt. No. 12).

2.    The ALJ failed to properly assess plaintiff's inability to maintain regular attendance. (Pl.'s Br. at 8-11).

3.    The ALJ failed to properly account for plaintiff's agoraphobia, and its impact on plaintiff's ability to perform the necessary mental functions for work. (Pl.'s Br. at 11-20).

4.    The ALJ's determination at step five is not supported by substantial

evidence. (Pl.'s Br. at 20-21).

Defendant argues that the Commissioner's determination is supported by substantial evidence, and that the complaint should be dismissed.[7] (Dkt. No. 15).  For the following reasons, the court agrees with plaintiff that the ALJ's determination at steps four and five was not supported by substantial evidence, and I will order a remand for further proceedings.

## VI.  RFC/TREATING PHYSICIAN/WEIGHT OF THE EVIDENCE

### 1.  Legal Standards

#### a.  RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must

---

[7] Plaintiff filed a reply brief. (Dkt. No. 19).

specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### 2. Treating Physician

"Under the treating physician rule, deference is given to the opinions of the physician who has provided the primary treatment for the patient." *Rugless v. Comm'r. of Soc. Sec.*, 548 F. App'x. 698, 699-700 (2d Cir. Dec. 19, 2013). "SSA regulations advise claimants that a treating source's opinion on the issues of the nature and severity of [their] impairments will be given 'controlling weight' if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Green Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must properly analyze the reasons that a report of a treating physician is rejected. *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2004). An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3. Weight of the Evidence

In making his determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.* In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

### B. Application

The court finds that the ALJ's RFC determination was, in most respects, supported by substantial evidence. However, the ALJ's inconsistent consideration of the impact of plaintiff's "agoraphobia" on his ability to perform the necessary mental functions for work reflects a fatal error in the ALJ's analysis at steps four and five.

Plaintiff first argues that although the ALJ found that plaintiff had a "moderate limitation [in] maintaining social functioning and [a] moderate limitation [in]

maintaining concentration, persistence, or pace," the ALJ did not include these limitations in his RFC determination. (Pl.'s Br. at 6-8). Plaintiff argues that the ALJ gave Dr. Harding great weight, but neglected to include Dr. Harding's finding of "moderate" limitations. (*Id.* at 6). This court finds that, while plaintiff does have "moderate" limitations in various areas, the ALJ properly considered these limitations and gave proper weight to the reports in the record.

Plaintiff argues that the ALJ must specifically include the "moderate" limitations in his RFC evaluation in order for the RFC to be valid, and, that *Curry v. Apfel*, 209 F.3d 117, 123-24 (2d Cir. 2000) supports the argument that the term "moderate" limitation is vague and does not support the ALJ's finding that plaintiff retains the mental functioning to meet the demands of full-time work. Plaintiff's first arguments do not justify a remand in this case.

In *McIntyre v. Colvin*, 758 F.2d 146, 150-51 (2d Cir. 2014), the court held that the ALJ's failure to incorporate plaintiff's non-exertional limitations in a hypothetical is harmless error if the "medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work, despite limitations in concentration, persistence, and pace," and the challenged hypothetical "'otherwise impliedly account[ed] for a claimant's limitations in concentration, persistence and pace.'" *Id.* at 151. In *Huestis v. Comm'r of Soc. Sec.*, No. 2:13-CV-201, 2014 WL 4209927, at *5-6 (D. Vt. Aug. 25, 2014), the court held that the ALJ's hypothetical to the VE "implicitly accounted for [plaintiff's] limitations . . . ." *Id.* at *6. The court in *Huestis* relied on the Second Circuit's opinion in *McIntyre. Id.* at *5 (quoting *McIntyre, supra*) (quoting

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). In *Blessing v. Colvin*, No. 3:14-CV-1489, 2015 WL 7313401, at *6 (N.D.N.Y. Nov. 19, 2015), the court extended *McIntyre* to a case such as this one, in which the court did not elicit the opinion of a VE. *Accord Ross v. Colvin*, No. 13-CV-6332, 2015 WL 1189559, at *11-13 (W.D.N.Y. Mar. 16, 2015).

In *Ross*, the court found that although the ALJ did not discuss each of the moderate limitations assessed by the state agency physician, "he incorporated moderate limitations into his RFC by restricting Ross to jobs that require an individual to understand, remember and carry out simple instructions, make only simple work-related decisions and maintain attention and concentration for only two hour segments." *Id.* at *12 (citing *Retana v. Astrue*, No. 11-CV-105, 2012 WL 1079229, at *6 (D. Colo. 2012) (the ALJ did not have to thoroughly discuss each moderate limitation, when his RFC "adopted some of the [doctor's] moderate limitations such as restricting plaintiff to unskilled work not involving complex tasks, which also reflected his moderate limitations in his ability to carry out detailed instructions and to maintain concentration for extended periods)).

Plaintiff's citation of *Curry v. Apfel* does not support his argument. In *Curry*, the Second Circuit held that a consultative physician's use of the terms "moderate" and "mild" as they related to restrictions on physical functions such as "sitting" was too vague to constitute substantial evidence that the plaintiff could perform the requirements of sedentary work. 209 F.3d at 123-24. While this general statement may still be true, more recent cases have held that when there is other medical evidence in

addition to an RFC evaluation using terms such as "mild" and "moderate," such terms may properly be used in the RFC analysis. *See Tankisi v. Commissioner of SS*, 521 F. App'x 29, 34 (2d Cir. 2013). In addition, the court notes that, unlike physical limitations, mental limitations are often categorized as "mild," "moderate," or "severe." Plaintiff's counsel's own questionnaire asks for mental restrictions using these terms in addition to "medium," "marked," and "extreme.". (T. 331, 333-34, 336-37). Thus, the use of the term "moderate" in itself, is not error, and the ALJ was not required to specifically incorporate the term into his RFC.

Plaintiff also argues that the ALJ failed to give proper weight to plaintiff's treating sources, PA Vincent and LSW Butler. However, a careful review of the ALJ's decision shows that the ALJ gave little weight to the questionnaires completed by these two health professionals. The ALJ's decision to give less weight to these questionnaires is supported by substantial evidence. The ALJ specifically states that he relied on the contemporaneous treatment notes of these medical care providers, rather than on the very restrictive questionnaires that they completed. (T. 21). Nurse practitioners, physician assistants, and social workers are defined as "other sources" whose opinions may be considered in determining the severity of plaintiff's impairment, but need not be given controlling weight. *Williams v. Colvin*, No. 15-CV-4173, 2016 WL 3034494, at *9 (S.D.N.Y. May 26, 2016) (citing *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (citing inter alia 20 C.F.R. § 416.913 (d)(1)). However, even analyzing the treating sources' opinions under the treating physician standard, this court agrees with the ALJ that the questionnaires are inconsistent with the

contemporaneous treatment notes and the restrictions contained therein are not supported by the other evidence in the record, including the reports of the two consultative psychologists.

The questionnaires that were sent to PA Vincent and LSW Butler.[8]  Although PA Vincent[9] checked a box on the questionnaire, indicating that plaintiff had a "marked" limitation in the ability to interact with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to ordinary stressors in the work setting.  However, her contemporaneous notes do not support such limitations. (T. 334).  PA Vincent's contemporaneous progress notes discuss plaintiff's depression and agoraphobia. (*See* T. 263, 297 - Aug. 31, 2012, Sept. 14, 2012).  On December 12, 2012, plaintiff told PA Vincent that the would like to take something for his anxiety because it was "getting worse," (T. 294).  However, on February 26, 2013, PA Vincent noted that plaintiff was doing better on the Effexor than on the Zoloft, and stated that he wished to try Ambien for his sleep disturbance. (T. 291). PA Vincent prescribed Ambien and noted that plaintiff's depression had improved. (*Id.*)

On March 26, 2013, PA Vincent noted that plaintiff's sleep had "improved

---

[8] The difference in the questionnaires is that PA Vincent's questionnaire also contains questions regarding plaintiff's physical abilities, while the questionnaire sent to LSW Butler only contains the mental RFC questions.  The mental RFC questions are identical in both questionnaires. (T. 333-35 (PA Vincent), 336-38 (LSW Butler)).

[9] Although PA Vincent was prescribing the medication for plaintiff's mental impairment, her focus appears to have been care of his physical condition.

tremendously" on the Ambien she prescribed and that he was "able to be much more active during the day and feels more wide awake and unable [sic] to do things." (T. 289). Plaintiff assessed his depression as "overall better" because he was getting more sleep. PA Vincent concluded that plaintiff's depression and sleep disturbance had "improved." (*Id.*) PA Vincent did not mention or evaluate plaintiff's anxiety on either February 26 or March 26.

LSW Butler's questionnaire is dated December 11, 2013 and states that it covers from June 13, 2012 until December 11, 2013. LSW Butler states that plaintiff has many marked and some extreme limitations, including marked limitations in maintaining attention and concentration, completing a normal work day, and responding appropriately in a work setting. (T. 336-37). LSW Butler stated that plaintiff had "extreme" limitations in the ability to interact appropriately with the general public, and respond appropriately to ordinary stressors in the work setting. (T. 337). "Extreme" is defined as "no or very little useful ability to function in this area." (T. 336). LSW Butler also opined that plaintiff would only have a medium limitation in the ability to perform activities within a schedule and maintain regular attendance. (T. 336). LSW Butler also stated that plaintiff would have "no" limitation in sustaining an ordinary routine without general supervision and only a "more than slight" limitation in getting along with co-workers or peers without distracting them or exhibiting behavioral extremes. (T. 336-37).

Even though LSW Butler assessed an "extreme" limitation in the ability to interact with the general public and respond appropriately in a work setting, on August

13, 2012, LSW Butler noted that plaintiff was "very uncomfortable" around people and "would need to work in a situation with very little human contact." (T. 326).  On August 29, 2012, LSW Butler stated that plaintiff felt anxious about leaving the house to come to the appointment, but wanted to overcome his fears. (T. 324).  LSW Butler stated that "any work situation" would need to involved "limited contact with others & a setting where people are friendly and positive with each other," although plaintiff himself was "unsure if he could handle [full-time] work." (*Id.*)  On September 12, 2012, LSW Butler stated that plaintiff was "genuinely" struggling with social anxiety and "is interested in disability," but referred him to the VIP Program to "further assess ability to work to pursue employment." (T. 323).  On December 31, 2012, plaintiff stated that he "could possibly tolerate work where he is not around too many people." (T. 320).  Plaintiff's attendance at counseling had improved, and he "acknowledg[ed] that knowing [the] consequences of missing [appointments] (i.e. closing case) [helps] motivate him."[10] (*Id.*)  It appears from LSW Butler's note that plaintiff could be "motivated" to leave his home. (*Id.*)  LSW Butler continued to check a box on his form, indicating that plaintiff was making "some progress." (T. 325, 326, 327, 320, 319, 318, 317, 316, 314, 312).

On February 6, 2013, LSW Butler indicated that although plaintiff continued to "have difficulty" leaving the house and was "uncomfortable" around people, he was going to court the next day on a child custody matter. (T. 318).  In February of 2013,

---

[10] Although LSW Butler noted that plaintiff had missed appointments due to "agoraphobia," he was warned that continuing to miss appointments would result in closing his case. (T. 322).

LSW Butler stated that although plaintiff continued to experience social anxiety, he was trying to "desensitize" by going out more by visiting his sister and going to the grocery store, although he still refused to take public transportation. (T. 316, 317). Although plaintiff visited the emergency room for a psychological reason in March of 2013, he ultimately stated that what he did before his CPEP visit was "stupid." (T. 314). On April 29, 2013, plaintiff told LSW Butler that he had trouble leaving the house, but that he was trying to get out of the house more often during the better weather. (T. 312).

In May of 2013, plaintiff told LSW Butler that although he continued to have trouble leaving the house, he intended to seek out GED training and stated that he would try to be in a class if it was "very small." (T. 311). On May 22, 2013, LSW Butler stated that although plaintiff remained agoraphobic with anxiety issues, he "can be motivated to leave the house more to accommodate his son who visits on weekends." (T. 310). LSW Butler stated on October 2, 2013 that plaintiff's greatest barrier to working was that he was "anxious around people." (T. 305).

The narrative reports of both LSW Butler and PA Vincent are more consistent with the reports of Dr. Moore and Dr. Harding than are their questionnaire responses.[11]

---

[11] Plaintiff argues that the ALJ should not have discounted PA Vincent's and LSW Butler's opinions simply because they were on "blank forms," because Dr. Harding, whom the ALJ accorded "great weight," also used a "form." However, the ALJ did not base the weight he gave PA Vincent's and LSW Butler's questionnaires solely upon the nature of the "form" reports. In addition to stating that they used a "blank form," the ALJ stated specifically, that the questionnaire responses were inconsistent with the narrative reports of these two treating sources, and that the mental limitations found by the ALJ were based on the contemporaneous progress notes, rather than on the questionnaire responses. (T. 21). In *Halloran v. Barnhart*, 362 F.3d 28, 31 n.2 (2nd Cir. 2004), the Second Circuit noted the "limited value of the standardized check-box forms, which are considered only marginally useful for purposes of creating a reviewable factual record." *See Sabater v. Colvin*, No. 12-CV-4594, at *5 n.6 (S.D.N.Y. Mar. 10, 2016) (citing cases, including *Halloran, supra*). There are case, holding that

Dr. Moore found that plaintiff was generally cooperative and that his manner of relating and his social skills were adequate. (T. 284). His attention, concentration, and memory were all "intact," and his cognitive functioning was in the average range. (T. 285). Dr. Moore accepted the fact that plaintiff had anxiety, which could cause problems with relating adequately to others, making appropriate work decisions, and maintaining a regular work schedule. However, the fact that plaintiff has limitations does not indicate that he is disabled.

Plaintiff argues that Dr. Moore's statement that plaintiff's mental impairments would "significantly interfere with the claimant's ability to function on a daily basis," indicates that there are "severe limitations to the potential occupational base." (Pl.'s Br. at 13). However, as defendant points out, the definition of a severe impairment is one which would significantly interfere with an individuals daily activities. However, severity is only the second step of the disability evaluation, and the ALJ continued the disability analysis to step five. Thus the ALJ properly gave little weight to the questionnaires completed by LSW Butler and PA Vincent.[12]

Plaintiff also argues that the ALJ failed to take into account plaintiff's low

---

check-the-box questionnaires are a proper format for a treating physician to express an opinion. *Goble v. Colving*, No. 15-CV-6302, 2016 WL 3179901, at *5 (W.D.N.Y. June 8, 2016) (citations omitted). This court does not question that check-the-box forms are widely used and are not invalid simply because of the nature of the form; however, in this case, the questionnaire was inconsistent with the medical professionals' narrative reports and the other evidence of record. Thus, the ALJ's decision to give little weight to these reports is supported by substantial evidence.

[12] This would include PA Vincent's and LSW Butler's finding that plaintiff would be absent from work 2-3 or "more than 3" times per month. (T. 334, 337). Plaintiff makes this a separate argument in his brief, but because the ALJ's determination to give these questionnaire's little weight is supported by substantial evidence, there is no need to separately discuss their opinions on attendance.

Global Assessment of Functioning ("GAF") score.[13]  However, "'[w]hile it is true that GAF scores may be relevant to an ALJ's severity and RFC determinations . . . , the ALJ need not specifically mention the GAF score.'" *Blessing v. Colvin*, No. 3:13-CV-1489, 2015 WL 7313401, at *7 (N.D.N.Y. Nov. 19, 2015) (citing *Marvin v. Colvin*, No. 3:12-CV-1779, at *2 (N.D.N.Y. Mar. 31, 2014); *Ortiz Torres v. Colvin*, 939 F. Supp. 2d 172, 184 (N.D.N.Y. 2013) (holding that "[t]his Court rules that the hearing officer's failure to discuss the [GAF] scores does not constitute an error worthy of remand"); *Dwyer v. Astrue*, 800 F. Supp. 2d 542, 548 (S.D.N.Y. 2011) (noting that "the ALJ's failure to mention [the claimant's] GAF of [fifty] is insufficient to conclude that she failed to consider it").  In this case, the GAF score was listed in LSW Butler's reports.  The ALJ considered the reports and thus, his failure to mention the GAF score was not reversible error. *See also Parker v. Comm'r of Soc. Sec.*, No. 10-CV-195, 2011 WL 1838981, at *5 (D. Vt. May 13, 2011) ("'GAF scores – in and of themselves – do not demonstrate that an impairment significantly interferes with a claimant's ability to work'").

Plaintiff argues that the ALJ failed to properly account for plaintiff's "agoraphobia" and its impact on plaintiff's ability to perform the necessary mental functions for work.  The court finds that in that respect, the ALJ's step four and step five determinations are not supported by substantial evidence.

The ALJ found that plaintiff had past relevant work as a cook and a dishwasher,

---

[13] The GAF is a 100 point scale.  A score of 41-50 indicates "serious symptoms," 51-60 indicates "moderate symptoms," and 61-70 indicates "some mild symptoms." AMERICAN PSYCHIATRIC ASSN., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th Ed. Text Revision 2000) ("DSM-IV-TR").

"but the work was performed in the presence of others, and allegedly brought on anxiety that was the reason he stopped that work. Based on his [RFC], I find that he **cannot perform any of that work**." (T. 21). The ALJ did not find that plaintiff's alleged anxiety or agoraphobia were "severe" at step two.[14] The ALJ's decision indicates that, although he did not find plaintiff's anxiety "severe," he nonetheless considered plaintiff's anxiety in determining his RFC because he apparently found that plaintiff could not perform his past relevant work due to his anxiety. However, there is no mention of plaintiff's inability to work around other people in ALJ's RFC determination. That inconsistency reflects a fatal error in the ALJ's analysis at steps four and five.

At step five of the disability analysis, the burden of proof shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step by applying the applicable Medical-Vocational Guidelines

---

[14] The court understands that even though an impairment is found to be not severe at step two, the ALJ will consider even non-severe impairments in his overall determination. Often, when there are multiple impairments, and the ALJ finds some, but not all of them severe, an error in the severity analysis at step two may be harmless because the ALJ continued with the sequential analysis and did not deny the claim based on the lack of a severe impairment alone. *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)). This is particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity. 20 C.F.R. §§ 404.1523, 416.923. Although the ALJ may not have committed a fatal error at step two by not finding plaintiff's anxiety severe, that finding was inconsistent with the ALJ's analysis at steps four and five. Moreover, the court would point out that all the medical providers diagnosed some form of anxiety disorder, including Dr. Moore and Dr. Harding to whom the ALJ gave great weight. (T. 82 (Harding), 286 (Moore)). Dr. Harding specifically found that plaintiff's "anxiety disorder" was "severe." (T. 82).

("the Grids"). *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). But if plaintiff has non-exertional impairments, and if those non-exertional impairments "significantly limit the range of work" permitted by his exertional impairments, the ALJ may be required to consult a vocational expert ("VE"). *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986).

In this case, the ALJ found that plaintiff's anxiety prevented him from performing his previous work. However, the ALJ never mentions anxiety in the recitation of his RFC, and when the ALJ defines "low stress job" in his RFC analysis, he indicates that such a job requires only occasional decision-making, only occasional changes in the work setting, and only occasional judgment. (T. 18). There is no mention of plaintiff's ability to work around other individuals. Compounding this confusion, the ALJ states that "[despite plaintiff's] allegations of anxiety when around others, I have not found any mental work limitations in this area." (T. 22). The ALJ then finds that plaintiff can perform the basic demands of unskilled work and concludes that plaintiff is not disabled based upon this seemingly inconsistent finding.

As stated above, the burden is on the Commissioner at step five to determine whether the plaintiff can perform other work in the national economy. If plaintiff's claimed anxiety about working with other people was sufficient for the ALJ to find that plaintiff could not perform the jobs of dishwasher and cook, then, without more analysis, it is unclear how the ALJ could find that this anxiety would not significantly limit the range of even unskilled jobs that plaintiff could perform. Thus, this court finds that the ALJ's step five determination is not supported by substantial evidence.

On remand, the ALJ should clarify his findings and, if necessary, call a vocational expert[15] to determine whether there are other jobs in the national economy that plaintiff can perform.[16]

## VII.  NATURE OF REMAND

"When there are gaps in the administrative record or the ALJ has applied an improper legal standard . . . remand to the Secretary for further development of the evidence" is generally appropriate.  *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). Even though the ALJ's decision is not supported by substantial evidence, this court cannot conclude that "substantial evidence on the record as a whole indicates that the [plaintiff] is disabled."  Thus, I cannot order a remand solely for the determination of benefits.  *See Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996).

**WHEREFORE,** based on the findings above, it is hereby

**ORDERED**, that the decision of the Commissioner is **REVERSED** and this case **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for an appropriate determination of plaintiff's residual functional capacity, and a proper step five determination, consistent with this Memorandum Decision and Order.

Dated: June 14, 2016

Hon. Andrew T. Baxter
U.S. Magistrate Judge

---

[15] The ALJ's finding regarding plaintiff's prior work suggests that plaintiff's anxiety significantly limited the range of unskilled work that he could perform, which would suggest the need for a VE.

[16] In doing so, the ALJ may reconsider the implied finding that plaintiff's anxiety is not a severe impairment.